**IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA**

GEORGE BLANCO, M.D.,

      Plaintiff,

v.                                       Case No: 20-005075-CI

BAYFRONT HMA PHYSICIAN MANAGEMENT, LLC, &
CHSPSC, LLC

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, George Blanco, M.D., by and through the undersigned counsel, and pursuant to the Florida Rules of Civil Procedure, hereby files this Amended Complaint against Defendants, Bayfront HMA Physician Management, LLC ("Bayfront") and CHSPSC, LLC ("CHS") (collectively, "Defendants"), regarding Defendants' breach of Physician Employment Agreement, Defendants' violations of Florida's unpaid wage statute, CHS's tortious interference with Physician Employment Agreement, Defendants' breach of the implied covenant of good faith and fair dealing, and Defendants' unjust enrichment. Plaintiff seeks actual damages, attorneys' fees, costs, interest, equitable relief, and any other relief the Court deems appropriate.

Plaintiff reserves the right to assert a claim for punitive damages upon the Court's determination that the applicable statutory prerequisites have been met.

# Exhibit A

**PARTIES**

1.      Plaintiff is a cardiologist licensed to practice medicine in the State of Florida.

2.      Plaintiff resides in St. Petersburg, Florida (zip code 33702). The facts giving rise to this lawsuit occurred in St. Petersburg, Florida (zip code 33701).

3.      Bayfront is a Florida limited liability company and wholly owned subsidiary of Community Health Systems, Inc.

4.      From approximately August 27, 2018 through September 30, 2020, Plaintiff was a W-2 employee of Bayfront at 701 6th Street South, St. Petersburg FL 33701.

5.      Bayfront's principal place of business is 4000 Meridian Boulevard, Franklin, Tennessee 37067.

6.      CHS is a Delaware for-profit corporation and wholly owned subsidiary of Community Health Systems, Inc.  CHS provides management services for certain entities affiliated with Community Health Systems, Inc., including Bayfront.

7.      Based upon information and belief, CHS is the employer entity of the CHS decision-makers who instructed Bayfront to breach Plaintiff's Physician Employment Agreement and deny Plaintiff's demands for back-pay.

8.      CHS's principal place of business is 4000 Meridian Boulevard, Franklin, Tennessee 37067.

9.      During Plaintiff's Bayfront employment, employees of CHS exercised direct control over Plaintiff's employment, and CHS was Plaintiff's joint employer.

10.      CHS exercised direct control over Bayfront's decisions regarding Plaintiff's employment, including the decisions to deprive Plaintiff his earned wages.

11.     CHS's control over Bayfront was so direct that Bayfront was a mere instrumentality of CHS.

12.     Plaintiff had a CHS email address, accessed the CHS Physician Database, went through CHS training, received work directives and reports from CHS, had meetings with CHS, communicated problems and issues to CHS's Regional Director of Operations, Todd Hightower, received responses from Mr. Hightower regarding CHS's employment decisions relating to Plaintiff, and Plaintiff understood CHS was his co-employer in every respect.

13.     According to Bayfront's corporate filings available on sunbiz.org, the only three named "managers" of Bayfront are CHS Executives: CHS's Chief Financial Officer, Kevin Hammons; CHS's Executive Vice President and General Counsel, Benjamin Fordham; and CHS's Chief Operating Officer, Tim Hingtgen. Based upon information and belief, CHS is the employer entity of Mr. Hammons, Mr. Fordham, and Mr. Hingtgen.

**JURISDICTION AND VENUE**

14.     Pursuant to Section 10 of Plaintiff's Physician Employment Agreement, which is incorporated herein by reference, Pinellas County, Florida is the proper venue for this lawsuit and Florida law applies to this dispute.

15.     Jurisdiction in this Court is proper because the facts giving rise to this lawsuit occurred in St. Petersburg, Florida, and Plaintiff resides and worked for Defendants in St. Petersburg, Florida.

16.     Plaintiff asserts claims for damages in excess of $150,000.

3

**FACTS**

*I.*     *Plaintiff's Physician Employment Agreement: Background*

17.     In 2018, Defendants, by and through John McLain, then-Bayfront CEO, Joseph Smith, Bayfront Administrator, Julie Minnick, then-CHS Division Vice President of Physician Practice Operations, Joseph Mullany, then-Regional Bayfront CEO, and other representatives of Bayfront and CHS, entered negotiations with Plaintiff and other cardiologists to become employed cardiologists of Bayfront.

18.     In a statement by then-CEO McLain to the Tampa Bay Times, published on August 24, 2018, McLain stated the goal of Bayfront expanding its cardiology program was to "let St. Petersburg area residents know that Bayfront Health is equipped to tackle the most complex cardiology cases and there's no need to go to Tampa for that kind of expertise."     See:     https://www.tampabay.com/news/health/St-Pete-s-new-pulse-spurs-Bayfront-Health-to-grow-its-heart-program_171112279/.

19.     Prior to Plaintiff and then-CEO McLain signing the Physician Employment Agreement on June 28, 2018, Plaintiff, Joseph Smith, Julie Minnick, John McClain, and Joseph Mullany, and others, negotiated the terms of the Physician Employment Agreement.

20.     The cardiologists at issue, including Plaintiff, had bargaining power during the negotiations because Bayfront desired to become a premiere cardiology hospital in St. Petersburg, Florida.

21.     During the 2018 Physician Employment Agreement negotiations, Plaintiff, Joseph Smith, Julie Minnick, and others, agreed that electrocardiograms ("EKGs") would

be included in the calculation of Work Relative Value Units (wRVUs) within the Compensation section of the Physician Employment Agreement.

22.    The wRVU measures the amount of completed work performed by the cardiologist, instead of the actual dollar amounts associated with the work performed.

23.    Ms. Minnick, Mr. McLain, Mr. Mullany, and Mr. Smith also repeatedly confirmed Defendants would pay the cardiologists based on the cardiology services performed; not the services billed.

24.    Every current procedural terminology (CPT) Code, including reading and interpreting an electrocardiogram (EKG Read), has a corresponding relative value measured by wRVU.

25.    During Plaintiff's Bayfront employment, the corresponding relative value of an EKG Read, pursuant to the applicable CMS Schedule, was .17 wRVU.

26.    During the 2018 Physician Employment Agreement negotiations, Plaintiff, Joseph Smith, Julie Minnick, and others also specifically discussed and agreed there would be no requirement to submit timesheets to obtain Mid-Level Supervision Compensation, and, therefore, such a requirement was specifically excluded from the final, executed version of the Physician Employment Agreement.

27.    CHS's Corporate Legal Department, in conjunction with Julie Minnick, then CHS Division VP, and others, drafted and approved the Physician Employment Agreement at issue.

28.    On June 28, 2018, Plaintiff and Bayfront's then-CEO McLain signed the Physician Employment Agreement.

29.     Plaintiff entered into the Physician Employment Agreement with Bayfront on June 28, 2018 based in part upon, *inter alia*, the Parties' agreement that EKGs would be included in the calculation of wRVUs.

30.     Plaintiff also entered into the Physician Employment Agreement with Bayfront based in part upon, *inter alia*, the Parties' agreement that Plaintiff would receive Mid-Level Supervision Compensation every month that Plaintiff met the supervision standards set in the Physician Employment Agreement without the need to turn in timesheets to Bayfront or CHS.

## II. Plaintiff's Physician Employment Agreement: Compensation Terms

31.     The Physician Employment Agreement, *inter alia*, describes the compensation structure applicable to Plaintiff's Bayfront employment.

32.     Pursuant to the Physician Employment Agreement, which is incorporated herein by reference, Bayfront "shall pay [Plaintiff] according to the terms of this Schedule 1.2."

33.     Pursuant to Schedule 1.2(a), the term wRVU "shall mean the same thing as defined by CMS at 42 CFR 414.22, and as that definition is amended by CMS from time to time."

34.     Pursuant to Schedule 1.2(a), the wRVUs "that are calculated will be based on the CMS Physician Fee Schedule Relative Value File which covers the date of service for care rendered to each patient and may be reduced based on CMS's adjudication methodology pursuant to The Affordable Care Act of 2010, as amended, and further defined in the CMS Physician Fee Schedule Relative Value File, as amended."

6

35.     In other words, Bayfront was required to calculate Plaintiff's wRVUs based on the cardiology <u>services performed</u>; not based on the cardiology <u>services billed</u>.

36.     Pursuant to Schedule 1.2(a) of Plaintiff's Physician Employment Agreement: "Any reductions to wRVUs will be in proportion to the payment reductions included in the CMS adjudication methodology or those payment reductions by large managed care payors, as identified by Employer, which do not follow the CMS adjudication methodology."

37.     In other words, Bayfront could only reduce Plaintiff's wRVUs for appropriate and billable cardiology services performed if: (a) there were corresponding reductions in the published CMS Physician Fee Schedule Relative Value File, or (b) corresponding reductions by large managed care payors that did not follow the CMS adjudication methodology.

38.     Under the Physician Employment Agreement, Defendants did not have the contractual right to reduce Plaintiff's wRVUs based on Defendants' discretionary billing decisions, Defendants' discretionary collection decisions, or the dollar amount Defendants were actually paid or reimbursed for the cardiology services Plaintiff performed.

39.     Schedule 1.2 of the Physician Employment Agreement does not contain a contractual carve-out for the EKGs read and interpreted by Plaintiff during his Bayfront employment.

40.     Pursuant to Schedule 1.2, Plaintiff was entitled to be provided wRVU credit (and corresponding wage payment) based on the cardiology services Plaintiff performed; not the amount billed (or not billed) by Defendants.

41.     Plaintiff's wRVU calculation was not contingent upon Defendants' discretionary billing and collection decisions, including any voluntary decision by Defendants to not bill for EKG Reads.

42.     Plaintiff's wRVU calculation was not contingent upon Bayfront or CHS receiving payment for the cardiology services Plaintiff performed.

43.     Pursuant to Schedule 1.2(b) of the Physician Employment Agreement, during the first 24 months of the Agreement Plaintiff would be compensated "the greater of" Plaintiff's base salary or a specific dollar amount per wRVU ("Conversion Factor").[1]

44.     In other words, if Plaintiff's wRVUs multiplied by the agreed-upon Conversion Factor exceeded the guaranteed base salary during the first 24 months of the Physician Employment Agreement, Plaintiff would be paid based on the wRVUs rather than the base salary.

45.     Pursuant to the Physician Employment Agreement, for months 24-60 of the Physician Employment Agreement, Plaintiff's compensation "shall be calculated by the number of Work RVUs from professional services personally provided by Physician that meet or exceed the Work RVU Target, as calculated by Employer, multiplied by the Work RVU Rate as set forth below in this Schedule 1.2(c) ("wRVU-based compensation"). Such Compensation shall be reconciled quarterly and payable in accordance with Employer's normal payroll policies, subject to customary withholding of taxes, FICA contribution, etc."

---

[1] The Physician Employment Agreement and its terms, including the specific dollar amount per wRVU, known as the Conversion Factor, may be considered Confidential and Proprietary Information. Therefore, such details will be provided after the Parties have entered into an Agreed Protective Order.

46.     In other words, for employment months 24 and beyond, Plaintiff was entitled to be paid for each wRVU that exceeded his specified Bayfront wRVU Target multiplied by the applicable, agreed-upon Conversion Factor.

### III.     Defendants' Refusal to Provide Plaintiff wRVUs for EKG Reads

47.     Plaintiff began his employment with Defendants on or about August 27, 2018.

48.     Throughout Plaintiff's Bayfront employment, he exceeded his base salary and wRVU Target and was required to be paid based upon his wRVUs multiplied by the applicable, agreed-upon Conversion Factor.

49.     During Plaintiff's employment, Plaintiff personally read and interpreted more than 10,164 EKGs.

50.     Defendants maintain records regarding the specific number of EKG Reads by Plaintiff during his Bayfront employment.

51.     Defendants did not credit Plaintiff with any wRVUs for any of the hospital EKGs Plaintiff personally read and interpreted while employed with Bayfront.

52.     CHS instructed Bayfront to not pay Plaintiff for the wRVUs attributable to the EKGs Plaintiff personally read and interpreted while employed with Bayfront.

53.     On July 8, 2020, during a Bayfront cardiology meeting with Todd Hightower, CHS Regional Director of Operations, Mr. Hightower told Plaintiff and others that CHS Corporate would not allow Bayfront to pay Plaintiff for the EKGs Plaintiff personally read and interpreted.

54.     When Plaintiff asked for an explanation, Mr. Hightower stated the decision was made by CHS corporate employees above his paygrade.

55.     Defendants owe Plaintiff back-wages for the hospital EKG Reads Plaintiff performed during his Bayfront employment as follows: Total Number of EKG Reads x .17 wRVU x Agreed-Upon Conversion Factor.

### IV.     *Defendants' Demands that Plaintiff to Sign an Agreement with First Coast*

56.     Instead of providing Plaintiff with wRVU credit for EKG Reads as promised by Defendants' agents and within the Physician Employment Agreement, Defendants asked Plaintiff to sign a "Professional Services Independent Contractor Agreement" ("IC Agreement") with Cardiology Interpreters, Inc. and First Coast Billing Group, Inc. ("First Coast") for "EKG Reading Services at 15%."

57.     In other words, Defendants voluntarily chose to outsource any billing and collection of Plaintiff's hospital EKG Reads to a third-party billing vendor, First Coast.

58.     Based upon information and belief, Defendants made the business decision to outsource EKG billing and collections to First Coast because of low reimbursement rates for EKG Reads.

59.     Defendants did not instruct Plaintiff to stop performing hospital EKG Reads.

60.     Reading and interpreting EKGs is an essential cardiology service. EKG Reads frequently lead to other cardiology and hospital services that are more lucrative for Defendants.

61.     The IC Agreement is a side agreement that is not referenced or contemplated within Plaintiff's Physician Employment Agreement.

10

62.     The IC Agreement is a side agreement that is not permitted by Plaintiff's Physician Employment Agreement without an Addendum to the Physician Employment Agreement.

63.     Signing the IC Agreement would have resulted in less money to Plaintiff than if Bayfront paid Plaintiff for the wRVUs attributable to the EKGs Plaintiff read and interpreted.

64.     Plaintiff did not sign the IC Agreement with First Coast.

65.     In April 2020, after Plaintiff rejected the IC Agreement and repeatedly demanded payment for the wRVUs attributable to EKG Reads, Bayfront placed two signature pages on Plaintiff's work desk with "sign here" stickers where Plaintiff was instructed to sign.

66.     The two signature pages were signed by Morris Moran of First Coast Billing Group, Inc., and were, upon information and belief, backdated to July 1, 2018 by Mr. Moran.

67.     Again, Plaintiff did not sign the First Coast signature pages re-presented to Plaintiff for the second or third time.

68.     Bayfront received over $25,000 in payments from First Coast for EKGs read and interpreted by Plaintiff during his Bayfront employment.

69.     Based upon information and belief, Bayfront had no right to receive and retain the money from First Coast that related to Plaintiff's EKG Reads without giving corresponding wRVU credit to Plaintiff.

70.    After receipt of Plaintiff's September 2020 Attorney Demand Letter, Bayfront returned $25,635.71 to First Coast and instructed First Coast to provide Plaintiff with a $25,635.71 check.

71.    To date, Plaintiff has not cashed the $25,635.71 check or any check from First Coast.

V.    *Additional wRVU Reductions in Violation of Plaintiff's Agreement*

72.    As an additional basis for Plaintiff's claims, based upon information and belief, Defendants systemically and intentionally reduced the wRVUs credited to Plaintiff beyond the wRVU reductions permitted pursuant to Plaintiff's Physician Employment Agreement or any wRVU reductions required by law.

73.    Rather than providing wRVU credit to Plaintiff based upon the CPT Codes submitted by Plaintiff at the time of the cardiology services performed, Defendants improperly diminished Plaintiff's wRVUs based on an internal billing methodology. These reductions were not contemplated or permitted by the Physician Employment Agreement.

74.    Based upon information and belief, Defendants improperly reduced Plaintiff's wRVU calculations by 200 or more wRVUs during Plaintiff's Bayfront employment.

75.    Based upon information and belief, Defendants are aware of the wRVU discrepancies but have failed to disclose and reconcile the problem by providing wRVU credit (and corresponding wage payment) based on Plaintiff's cardiology <u>services performed</u>, rather than <u>services billed</u>.

76.    By improperly reducing the wRVUs in Defendants' favor, Defendants have paid Plaintiff less than what Plaintiff is owed pursuant to the Physician Employment Agreement.

### VI.    *Mid-Level Supervision Compensation*

77.    As an additional basis for Plaintiff's claims, pursuant to 1.2(e) of the Physician Employment Agreement, Plaintiff was also entitled to "Mid-Level Supervision Compensation for the performance of Mid-Level Supervision Duties" in a specified dollar amount[2] "per month per 1.0 FTE mid-level supervised up to a maximum of Three (3) 1.0 FTE mid-level providers."

78.    The Physician Employment Agreement does not require Plaintiff to submit timesheets to obtain the mid-level supervision compensation.

79.    Julie Minnick, then-CHS VP, and other agents of Defendants, agreed Plaintiff would receive the mid-level supervision compensation as a monthly stipend so long as Plaintiff performed the mid-level supervision duties and responsibilities as described in the Physician Employment Agreement.

80.    Schedule 1.3(B) of the Physician Employment Agreement describes the Mid-Level Provider Supervision Duties and Responsibilities that will result in Mid-Level Supervision Pay to Plaintiff.

---

[2] Physician Employment Agreement and its terms, including the Mid-Level Supervisor monthly compensation amount found within the Physician Employment Agreement, may be considered Confidential and Proprietary Information; therefore, such details will be disclosed after the Parties have entered into an Agreed Protective Order.

81.     During Plaintiff's Bayfront employment, Plaintiff supervised two (2) FTE mid-level providers that entitled Plaintiff to Mid-Level Supervision Compensation.

82.     Specifically, throughout Plaintiff's Bayfront employment, Plaintiff supervised Laura Akers, who is a mid-level provider.

83.     In addition, from January 2019 through Plaintiff's separation from Bayfront, Plaintiff also supervised Rebecca Simpson, who is a mid-level provider.

84.     Plaintiff provided supervision and consultation to Ms. Akers and Ms. Simpson during normal business hours; Plaintiff was available to Ms. Akers and Ms. Simpson when needed by telephone or direct telecommunications for consultation, assistance with medical emergencies, or patient referral and to discuss complications or problems not addressed by the established written clinical practice guidelines; and Plaintiff provided other supervision to each Mid-Level Provider as described in Schedule 1.3(B)(2)(a)-i).

85.     During each month of Plaintiff's Bayfront employment, Plaintiff reviewed 20 or more Mid-Level Providers' patient medical records and ensured/verified that Mid-Level Provider treatment and acts of limited prescriptive authority were provided in accordance with agreed upon clinical practice guidelines.

86.     Based upon information and belief, Plaintiff supervised and read over 250 nuclear stress tests that he performed with Laura Akers, mid-level provider.

87.     Plaintiff supervised and read an unknown number of traditional stress tests that he performed with a mid-level provider.

88.     Defendants are in possession of the records verifying the number of nuclear stress tests, traditional stress tests and other cardiology procedures, tests, consultations, patient encounters, notes, and orders where Plaintiff supervised a mid-level provider pursuant to the terms of the Physician Employment Agreement.

89.     Defendants did not pay Plaintiff any Mid-Level Supervision Compensation during his Bayfront employment.

90.     Defendants did not pay any Mid-Level Supervision Compensation pursuant to Section 1.2(e) to any of the Bayfront-employed cardiologists during Plaintiff's Bayfront employment.

91.     Based upon information and belief, CHS instructed Bayfront to not pay Plaintiff any mid-level supervision compensation.

92.     Defendants provided Plaintiff with no method or means of obtaining the Mid-Level Supervision Compensation promised in the Physician Employment Agreement.

93.     Based upon information and belief, Defendants agree Plaintiff is owed back-wages for Mid-Level Supervision Compensation in an amount to be determined.

**VII.    *St. Anthony's Hospital ER Call Stipend Pay Retained by Defendants***

94.     St. Anthony's Hospital is located at 1200 7th Ave N, Saint Petersburg, FL 33705. St. Anthony's Hospital is Bayfront's neighboring hospital in downtown St. Petersburg, Florida. During Plaintiff's Bayfront employment, Plaintiff routinely treated patients at both Bayfront and St. Anthony's Hospitals, frequently going back and forth between the two hospitals during the same workday.

95.    Per Plaintiff's Physician Employment Agreement, Bayfront agreed to provide Plaintiff with wRVU credit per cardiology service Plaintiff performed, regardless of whether the cardiology service took place at Bayfront, St. Anthony's, or another approved facility with Bayfront's knowledge and consent.

96.    Plaintiff also routinely took Emergency Room Call (ER Call) at St. Anthony's Hospital throughout his Bayfront employment with Bayfront's knowledge and consent.

97.    Beginning in November 2019, St. Anthony's Hospital provided a $1,000 ER Call Stipend (the "ER Call Stipend") for each date of ER Call that Plaintiff took at St. Anthony's Hospital.

98.    St. Anthony's Hospital began providing the ER Call Stipend at the request of the cardiologists who took the ER Call; not at the request or demand of Bayfront.

99.    The ER Call Stipend was intended for the cardiologists, including Plaintiff, who took ER Call at St. Anthony's Hospital.

100.    Based upon information and belief, St. Anthony's and Bayfront agreed in writing that one of the purposes of the ER Call Stipend money was to "enhance the interrelationships between the Participating Physicians" and St. Anthony's Hospital.

101.    Every six months, beginning in November 2019, St. Anthony's Hospital also offered a Quality Bonus of up to 20% of the total amount of ER Call Stipend money paid for Plaintiff taking St. Anthony's ER Call, which was based on Plaintiff's performance in relation to St. Anthony's quality goals.

102.   Based upon information and belief, Plaintiff met the criteria to earn one or more Quality Bonus(es), as determined and paid by St. Anthony's.

103.   Because Plaintiff was a Bayfront-employed cardiologist, St. Anthony's paid the ER Call Stipend money and Quality Bonus(es) to Bayfront.

104.   Defendants have records of each date Plaintiff took St. Anthony's ER Call from November 2019 through September 2020.

105.   Based upon information and belief, St. Anthony's Hospital paid Plaintiff's ER Call Stipend money and Quality Bonus(es) owed to Plaintiff to Bayfront so that Bayfront could pay Plaintiff.

106.   Bayfront should have passed through the ER Call Stipend money and Quality Bonus(es) to the Bayfront-employed cardiologists who took the ER Call, including Plaintiff.

107.   Bayfront never paid Plaintiff any ER Call Stipend money or Quality Bonus(es) that were received by Bayfront from St. Anthony's.

108.   Upon information and belief, CHS instructed Bayfront to not pay Plaintiff the ER Call Stipends and Quality Bonus(es).

109.   Instead, Defendants retained the ER Call Stipend money and Quality Bonus(es) paid by St. Anthony's to Bayfront that were intended for the Bayfront-employed cardiologists, including Plaintiff.

110.   Passing through the ER Call Stipends and Quality Bonus(es) to Plaintiff would not have resulted in Plaintiff being paid more than Fair Market Value.

111.   Based upon information and belief, the written agreement between St. Anthony's and Bayfront expressly states that the ER Call Stipend pay is consistent with fair market value in arm's length transactions and has not been determined in a manner that takes into account the volume or value of any referrals or business generated between the parties.

112.   Defendants did not seek a Fair Market Valuation or FMV "Refresh" to confirm paying the ER Call Stipends and Quality Bonus(es) to Plaintiff would not result in Plaintiff being paid more than Fair Market Value.

113.   Defendants' act of retaining the ER Call Stipends and Quality Bonus(es) unjustly enriched Defendants to the detriment of Plaintiff.

### VIII.   *The Annual Compensation Cap Amount Does Not Apply*

114.   The "Annual Compensation Cap Amount" pursuant to 1.2(f) of the Physician Employment Agreement does not bar the relief and back-wages sought through this lawsuit.

115.   First, the back wages Plaintiff demands from Defendants will not result in Plaintiff exceeding Plaintiff's "Annual Compensation Cap Amount" for 2018, 2019, or 2020, pursuant to 1.2(f) of the Physician Employment Agreement.

116.   Second, the Annual Compensation Cap Amount stated in 1.2(f) of Schedule 1.2 was removed pursuant to an amendment to the Physician Employment Agreement, signed by both Parties.

### IX.   *Plaintiff's Pre-Suit Demands*

18

117.    On May 15, 2020, July 28, 2020, and September 25, 2020, Plaintiff sent written demands to Defendants for back wages owed to Plaintiff. Plaintiff also made verbal demands for payment to Defendants' agents, including but not limited to Robert ("Dave") Kicker, Sharon Hayes, Joseph Smith, Todd Hightower, and Julie Minnick.

118.    In July 2020 and again in September 2020, Plaintiff was informed that Defendants would not pay Plaintiff the back wages owed to Plaintiff.

119.    Plaintiff was specifically informed the decision was made by employees of CHS.

120.    Defendants have never provided Plaintiff any explanation regarding why Defendants believe Plaintiff is not owed the wages demanded by Plaintiff in this lawsuit.

### COUNT I — BREACH OF CONTRACT CLAIM AGAINST BAYFRONT AND CHS

Plaintiff reasserts and incorporates paragraphs 1-93 and 114-120 as though fully set forth herein.

121.    Bayfront entered into a valid and binding Physician Employment Agreement with Plaintiff.

122.    Defendants breached Plaintiff's Physician Employment Agreement by failing and refusing to pay Plaintiff the amounts owed pursuant to the Physician Employment Agreement.

123.    CHS and Bayfront are jointly liable and responsible for breaching Plaintiff's Physician Employment Agreement.

124.   As a result of Defendants breaching Plaintiff's Physician Employment Agreement, Plaintiff is owed back wages in an amount to be determined at trial plus interest at the Florida statutory rate.

### COUNT II – UNPAID WAGE CLAIM AGAINST BAYFRONT AND CHS

Plaintiff reasserts and incorporates paragraphs 1-93 and 114-120 as though fully set forth herein.

125.   Defendants promised to pay Plaintiff pursuant to the Compensation sections of Plaintiff's Physician Employment Agreement.

126.   Defendants breached the Physician Employment Agreement by failing and refusing to pay Plaintiff his earned wages.

127.   Plaintiff seeks all unpaid wages owed to him pursuant to the Physician Employment Agreement, plus interest at the Florida statutory rate.

128.   Defendants are jointly and severally liable to Plaintiff for the unpaid wages resulting from Defendants' breaches of Plaintiff's Physician Employment Agreement.

129.   Plaintiff additionally asserts a claim for attorneys' fees under Fla. Stat. § 448.08 as the Prevailing Party in this unpaid wage claim. *See* Fla. Stat. § 448.08 ("The court may award to the prevailing party in an action for unpaid wages costs of the action and a reasonable attorney's fee.").

### COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT AGAINST CHS
### (IN THE ALTERNATIVE)

Plaintiff reasserts and incorporates paragraphs 1-93 and 114-120 as though fully set forth herein.

130.    Plaintiff entered into a valid and binding Physician Employment Agreement with Bayfront.

131.    CHS has full knowledge of the terms of the Physician Employment Agreement entered into between Plaintiff and Bayfront.

132.    CHS employees drafted and approved the terms of the Physician Employment Agreement entered into between Plaintiff and Bayfront.

133.    One or more individuals employed by CHS were decisionmakers with respect to the decision to breach Plaintiff's Physician Employment Agreement by not paying Plaintiff wages for the wRVUs associated with the EKGs Plaintiff personally read and interpreted during his Bayfront employment.

134.    CHS instructed Bayfront to breach Plaintiff's Physician Employment Agreement by depriving Plaintiff wages for the wRVUs associated with the EKGs Plaintiff personally read and interpreted during his Bayfront employment.

135.    One or more individuals employed by CHS were decisionmakers with respect to the decision to breach Plaintiff's Physician Employment Agreement by not paying Plaintiff mid-level supervision compensation Plaintiff earned by supervising Laura Akers and Rebecca Simpson.

136.    CHS instructed Bayfront to breach Plaintiff's Physician Employment Agreement by depriving Plaintiff wages for the mid-level supervision compensation promised under the Physician Employment Agreement.

137.    One or more individuals employed by CHS were decisionmakers with respect to the decision to breach Plaintiff's Physician Employment Agreement by reducing

21

Plaintiff's wRVUs beyond what is permitted by the Physician Employment Agreement or required by law.

138.    CHS instructed Bayfront to breach Plaintiff's Physician Employment Agreement by improperly reducing Plaintiff's wRVUs.

139.    To the extent CHS is not directly liable for Bayfront's acts and omissions as Plaintiff's joint employer, CHS's intentional and unjustified interference with the Physician Employment Agreement between Plaintiff and Bayfront constitutes tortious interference that has resulted in significant damages in an amount to be determined at trial.

## COUNT IV – BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING AGAINST BAYFRONT AND CHS

Plaintiff reasserts and incorporates paragraphs 1-93 and 114-120 as though fully set forth herein.

140.    Plaintiff and Bayfront entered into a valid and binding Physician Employment Agreement that governed the Plaintiff's employment with Bayfront.

141.    Bayfront and CHS were Plaintiff's joint employer.

142.    Under Florida law, every contract contains an implied covenant of good faith and fair dealing designed to protect the parties' reasonable expectations.

143.    In the Physician Employment Agreement, there is an implied promise of good faith and fair dealing by each Party not to do anything that will deprive the other party of the benefits of the contract.

144. During the Physician Employment Agreement negotiations, Defendants and Plaintiff discussed and agreed EKG Reads would be included in the calculation of wRVUs for purposes of determining physician compensation.

145. The executed version of Plaintiff's Physician Employment Agreement contains no contractual carve-out for EKG Reads from the calculation of Plaintiff's wRVUs.

146. EKG Reads are a cardiology service listed in the CMS Physician Fee Schedule.

147. Pursuant to the CMS Physician Fee Schedule, each EKG Read was valued at .17 wRVU throughout Plaintiff's Bayfront employment.

148. Plaintiff signed the Physician Employment Agreement based in part on the agreement that each hospital EKG Read would be valued as "defined by CMS" based on the CMS Physician Fee Schedule Relative Value File during Plaintiff's Bayfront employment.

149. Defendants deprived Plaintiff of the benefits of his bargain by refusing to include hospital EKG Reads in the calculation of Plaintiff's wRVUs.

150. Defendants deprived Plaintiff of the benefits of his bargain by voluntarily choosing to outsource any billing and collection of Plaintiff's EKG Reads to First Coast and using this voluntary decision as the basis for denying Plaintiff the wRVUs promised in the Physician Employment Agreement.

151. Defendants deprived Plaintiff of the benefits of his bargain by requiring Plaintiff to perform EKG Reads throughout his Bayfront employment without pay. EKG

Reads are a critical cardiology service that Plaintiff was required to perform throughout his Bayfront employment.

152.   Defendants also deprived Plaintiff of the benefits of his bargain by improperly reducing Plaintiff's wRVUs based on Defendants' internal billing methodology. Plaintiff was promised that he would be compensated based on the cardiology services performed; not the cardiology services billed.

153.   Defendants were not transparent regarding the reductions to Plaintiff's wRVUs and the reasons for such reductions that amount to 200 or more unpaid wRVUs. Based upon information and belief, Defendants were aware of the wRVU discrepancy during Plaintiff's Bayfront employment, but failed to disclose such discrepancy or to account for such discrepancy in the quarterly wRVU reports required by the Physician Employment Agreement.

154.   Defendants further deprived Plaintiff of the benefits of his bargain by promising Plaintiff Mid-Level Supervision Compensation without the need to submit timesheets, but then providing no method or means for Plaintiff to obtain the Mid-Level Supervision Compensation.

155.   As proof of Defendants' bad faith conduct, no Bayfront-employed cardiologist that worked with Plaintiff from 2018-2020 received any Mid-Level Supervision Compensation pursuant to the Mid-Level Supervision sections of the Physician Employment Agreement.

156.    Defendants' bad faith conduct did not comport with Plaintiff's reasonable contractual expectations under specific provisions of the Physician Employment Agreement, which is incorporated by reference herein.

157.    Plaintiff was harmed by Defendants' bad faith conduct.

158.    Defendants' bad faith acts and omissions unfairly interfered with Plaintiff's receipt of the contractual benefits required under the Physician Employment Agreement.

159.    Therefore, Plaintiff seeks all pay owed as described herein, interest, fees and costs, and any other relief the Court deems appropriate.

### COUNT V – UNJUST ENRICHMENT AGAINST BAYFRONT AND CHS

Plaintiff reasserts and incorporates the foregoing paragraphs 1-16, 94-120 as though fully set forth herein.

160.    Based upon requests from cardiologists, St. Anthony's agreed to provide the ER Call Stipend for each date Plaintiff took ER Call at St. Anthony's Hospital.

161.    The ER Call Stipend was intended to be paid to the cardiologists taking ER Call at St. Anthony's Hospital.

162.    St. Anthony's paid the ER Call Stipend money and Quality Bonus(ese) to Bayfront.

163.    Bayfront accepted and retained the benefit that was intended to benefit the physicians, including Plaintiff.

164.   Bayfront refused to pay Plaintiff the ER Call Stipend provided for Plaintiff's dates of taking of St. Anthony's ER Call or the Quality Bonus(es) for Plaintiff's quality of work while taking St. Anthony's ER Call.

165.   CHS intentionally directed Bayfront not to pay Plaintiff the ER Call Stipends and Quality Bonus(es).

166.   The circumstances are such that it would be inequitable for Defendants to retain the benefit without paying the value thereof to Plaintiff who performed the work.

**WHEREFORE**, Plaintiff seeks back wages in excess of $150,000, interest, attorneys' fees and costs, equitable relief, and any other relief that the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to the Florida Rules of Civil Procedure.

## NOTICE THAT PUNITIVE DAMAGES MAY BE SOUGHT

Plaintiff reserves the right to assert a claim for punitive damages upon the Court's determination that the applicable statutory prerequisites have been met.

DATED this 11th day of December 2020.


Respectfully submitted,


*/s/ Elizabeth Fite Blanco*
Elizabeth Fite Blanco, Esq. (Fla. Bar No. 0644439)
Rachel Morris, Esq. (Fla. Bar No. 0091498)
Dayle Van Hoose, Esq. (Fla. Bar No. 0016277)
**SESSIONS, ISRAEL & SHARTLE**
3350 Buschwood Park Drive, Suite 195
Tampa, FL 33618
Telephone No.: 813-748-2684
Facsimile No.: 866-466-3140


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via

electronic mail on December 11, 2020 to:


Tracey Jaensch, Esq.
Ford Harrison, LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, Florida 33602
Counsel for Defendants, Bayfront HMA Physician Management, LLC,
and CHSPSC, LLC


*/s/ Elizabeth Fite Blanco*
Elizabeth Fite Blanco, Esq.